# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 18-CR-156-JED |
| | ) |
| CHRISTOPHER ALLEN HAYES, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Defendant Christopher Allen Hayes ("Hayes") has been charged in this case with one count of felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Before the Court is Hayes's Motion to Suppress (Doc. 14). On September 9, 2018, the Court held a hearing on the motion, and Tulsa Police Officers Dean Montgomery and Kerry Whitten testified. Body cam and dash cam footage was admitted into evidence, as was the audio recording of the 911 call.

**I.     Background**

Around noon on May 31, 2018, Tulsa Police Department dispatch received a 911 call concerning a convenience store ("Kwik Stop") on 61st Street near Peoria Ave. The caller, who wished to remain anonymous, stated that there were about ten to twelve individuals—"anywhere from 16 to 25" years old—and "they possibly have weapons or something." He mentioned that there were "some drug activities and so forth going on" and that the individuals were both inside and outside of the store. When asked by the 911 operator if he had seen weapons, the caller responded, "Yes, yeah, they have knives and stuff." When prompted, the caller went on to say that

1

he had seen "a couple of them" with knives, but that "there might be some other ones, too." The operator then asked if the individuals were physically or verbally fighting, even though the caller had not mentioned fighting up to this point in the call. The caller's answer to this question is nearly inaudible, but he seems to say "a combination of both." When asked for his name, the caller refuses, stating that he wants to stay out of it.

Tulsa Police Officer Dean Montgomery arrived at the Kwik Stop first. According to his testimony, Officer Montgomery saw a large group of people, both male and female, standing in front of the store. (Tr. 11:6-8).[1] Officer Montgomery observed no fighting, no weapons, and no drug activity. (Tr. 50:16-23). As he pulled into the parking lot, he noticed "a group of individuals" that saw his marked Tulsa police car and began walking away from him, toward the east side of the Kwik Stop and out of his view. (Tr. 11:12-17). Officer Montgomery followed this group over to the east side of the building and noticed that some of the individuals had jumped over the back fence toward the Tamarack Apartments, which are situated to the north of the Kwik Stop. According to Officer Montgomery, this route to the Tamarack Apartments is so trampled upon that the grass going up to the fence does not grow and the decorative finials along the top of that section of the fence are missing.

Officer Montgomery—now joined by Officers Love and Parker—then decided to drive over to the Tamarack Apartments. Once there, the officers got out on foot and walked to where the individuals had jumped over the fence from the Kwik Stop. As the officers reached the fence, they realized that the individuals had hopped back over to the Kwik Stop lot. Officer Montgomery, looking through the fence, identified and described on his police radio two individuals (neither of

---

[1] The official transcript (Doc. 22) of the suppression hearing was filed on September 10, 2018.

whom was Hayes) that he believed were evading him. (Tr. 14:14-19, 15:6-10). These two individuals began walking to the south and east, away from the Kwik Stop, along with several other young, African-American men. These other men included Mr. Hayes, who was carrying a bag of food from the Kwik Stop. Officers Montgomery, Love, and Parker then jumped over the fence themselves. Officer Love can be heard on his body cam (1:15) exclaiming, "Aw, shit! White guy *can* jump!"

By this time, additional police officers were arriving at the Kwik Stop, including Officer Whitten and Corporal Goforth. All of the police officers on the scene—both on foot and in vehicles—quickly began to close in on the young men walking on the sidewalk. According to Officer Whitten, the officers were creating a "perimeter" around them. (Tr. 42:13-16). Corporal Goforth ordered the young men to stop, but they continued walking. (Tr. 15:23-25). One man, later identified as Vincent Hale, then started running and was pursued by Officers Montgomery, Love, and Parker.[2] In the meantime, Mr. Hayes and three other individuals were ordered to sit on the curb. After assisting with Mr. Hale, Officer Montgomery walked back over to where the four men were sitting, and the officers began patting down each individual. The government alleges that Hayes became noncompliant—that he was acting nervous and was taking things out of his pockets against instructions. When Mr. Hayes was frisked, the officers found a gun, ammunition, and $383 in cash on his person.

## II.    Relevant Law

When a law enforcement officer performs an investigative detention of a person, it is

---

[2] Mr. Hale eventually stumbled and was tackled by the three officers. Officer Love can be heard on his body cam (2:29) stating, "You just got caught by a white guy!" Upon searching Mr. Hale, Officer Love found a large baggie of marijuana.

referred to as a *Terry* stop. *See United States v. Hernandez*, 847 F.3d 1257, 1267-68 (10th Cir. 2017) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "Because a *Terry* stop is less intrusive than an arrest, the suspicion required to make such a stop is less demanding than what is required for an arrest." *Id*. at 1268. Still, such a stop is only permissible when an officer has "specific and articulable facts and rational inferences drawn from those facts" that give rise to a reasonable suspicion that a person is involved in criminal activity. *Id*. An officer's actions, in turn, must be justified at their inception and "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20.

"[T]he existence of objectively reasonable suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances." *Hernandez*, 847 F.3d at 1268 (quoting *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997)). "[D]eference is to be accorded to a law enforcement officer's ability to distinguish between innocent and suspicious actions." *Wood*, 106 F.3d at 946. Nevertheless, an officer "cannot legally detain a person simply because criminal activity is afoot." *United States v. Fisher*, 597 F.3d 1156, 1158 (10th Cir. 2010). Instead, "[t]he particular person that is stopped must be suspected of criminal activity." *Id*. at 1158-59.

Ultimately, the government has the burden of proof to justify warrantless searches and seizures. *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001). The applicable standard of proof is a preponderance of the evidence. *Id.* (citing *United States v. Matlock*, 415 U.S. 164, 177 (1974)).

### III.    Analysis

According to the government, the specific and articulable facts that led to a reasonable suspicion of illegal activity in this case are as follows: (1) the police received a 911 call regarding

a disturbance with weapons at the Kwik Stop; (2) the Kwik Stop is located in a "high crime area"; (3) Hayes was part of a group that evaded Officer Montgomery when he first arrived at the Kwik Stop; and (4) Hayes was part of a group that disobeyed Corporal Goforth's command to stop.

"Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). In assessing whether an anonymous tip gives rise to reasonable suspicion of illegal activity, the United States Supreme Court often requires something more. *See Florida v. J.L.*, 529 U.S. 266, 266 (2000) (finding that "[a]n anonymous tip that a person is carrying a gun is not, without more, sufficient to justify a police officer's stop and frisk of that person."). This is because "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Alabama*, 496 U.S. at 329.

In *Alabama v. White*, the anonymous caller specified multiple pieces of information that the police were able to corroborate: the time at which the suspect would be leaving a particular apartment complex, the type of car she would be driving, and her destination. 496 U.S. at 331. Thus, the anonymous tip "exhibited sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop" because the predictive information in the tip was corroborated by independent police work. *Id.* at 326-27.

Here, as in *Florida v. J.L.*, the anonymous caller provided the police "no predictive information and therefore left the police without means to test the informant's knowledge or credibility." 529 U.S. at 271. In fact, the caller here gave *less* information. In *Florida v. J.L.*, the caller stated that a young black male at a particular bus stop was carrying a gun. *Id.* at 268. The caller further stated that the young man was wearing a plaid shirt. *Id.* When the police arrived at the designated location, they saw a young black male who was wearing a shirt that matched the

5

description given by the caller. Nevertheless, the Supreme Court determined that such information was not sufficient to corroborate the tip.

In this case, the caller gave no specific details whatsoever about the individuals that "possibly" had weapons "or something." He gave no information regarding the gender or race of these individuals, much less what they were wearing. Instead, he referenced "ten to twelve" individuals and offered a nearly ten-year age range.

The Tenth Circuit has described the "level of specificity" as a concern relating to tips given to law enforcement. "Overly generic tips, even if made in good faith, could give police excessive discretion to stop and search large numbers of citizens." *United States v. Johnson*, 364 F.3d 1185, 1191 (10th Cir. 2004). By requiring additional detail from the tipster and corroborating observation by the police, the courts help "ensure that police do not use vague tips to violate the Fourth Amendment rights of innocent citizens." *Id*. In *United States v. Johnson*, the caller—although remaining anonymous—gave his cell phone number to the dispatcher and stayed on the line for approximately eight minutes. *Id*. at 1187. The caller described the actions and appearances of the two relevant individuals in detail. *Id*. On appeal, the Tenth Circuit determined that this call's "considerable detail significantly circumscribed the number of people police could have stopped in reliance on it." *Id*.

In stark contrast, the call in the present case could nearly encompass anyone in or near the convenience store. The only limiting description given by the anonymous caller is an age range, and, ironically, Defendant Hayes fell well outside of that range.[3] The call in this case is a perfect example of why the Constitution generally requires more than uncorroborated, anonymous 911

---

[3] According to the Defendant Information Sheet (Doc. 1), Hayes would have been nearly 28 years old at the time of this incident.

calls to justify a *Terry* stop.

In this case, there is more beyond the 911 call—but not much more. The government's witnesses established that the Kwik Stop is in a "high crime" area, which the Supreme Court has held to be a "relevant contextual consideration[] in a *Terry* analysis." *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Yet, the "high crime" character of the location does not somehow corroborate the anonymous 911 tip such that these two factors alone could provide the basis for a stop; otherwise, the general rule regarding anonymous tips would be rendered nearly meaningless.

The Court assumes that observed suspicious behavior by Mr. Hayes *may* have been sufficient, viewed in combination with the 911 call and the high crime character of the neighborhood, to support a reasonable suspicion of criminal activity here. The problem is that the government has failed to show that Mr. Hayes exhibited any suspicious behavior.

The government concedes that Defendant Hayes was not one of the individuals that hopped over the fence, (*see* Doc. 19 at 2), and it is undisputed that Hayes did not run away from the police officers at any point.[4] Instead, government's counsel contends that Hayes "was part of a group, some of whose members went over the fence and then came back over and then all left together as a group down the street." (Tr. 65:4-6).

At the hearing, Officer Montgomery insisted that Hayes was part of "the group" that had evaded him when he first arrived at the Kwik Stop. (Tr. 28:3-11). Yet, on the body cam video, Officer Whitten can be heard declaring, at least twice, that he saw Hayes leave the Kwik Stop "last." At minute-mark 4:25 of the Montgomery body cam video, Officer Whitten gestures to Hayes and states, "He was the last one I seen come out of the store . . . it's kind of like he was after

---

[4] In fact, Officer Montgomery can be heard on his body cam (4:04) saying to Hayes and the others on the curb that they were the "smarter ones" for <u>not</u> trying to run.

the fact . . . ." A few seconds later, Officer Whitten exclaims, "He [Hayes] did come out of the store last!" It is clear from the witnesses' testimony that Officer Whitten arrived at the Kwik Stop *after* Officer Montgomery had driven to the Tamarack Apartments. (*See* Tr. 41:17-20, 14:2-11). If Officer Whitten saw Hayes exit the Kwik Stop, then Hayes was presumably still inside when Officer Montgomery first arrived at the Kwik Stop. Thus, Hayes could not have been part of this "group" that walked away from Officer Montgomery when he first pulled into the Kwik Stop parking lot.[5] The Court rejects the government's broad, amorphous definition of "the group" and refuses to attribute evasive behavior by some individuals to a man who was not physically present when that behavior occurred.[6]

Thus, all that is established by the evidence is that Mr. Hayes exited the Kwik Stop with a bag of food and started walking away. In fact, Officer Whitten admitted as much on the witness stand:

| [COURT]: | Officer Whitten, did you ever see Mr. Hayes exhibit any suspicious behavior before he was put on the curb? |
|---|---|
| [WHITTEN]: | Was not obeying officer's request for them to stop so that we could interview them; that was suspicious with the call. |
| [COURT]: | They were walking down the sidewalk; right? |

---

[5] Notably, this conclusion is consistent with Hayes' own assertion, while forced to sit on the curb, that he was not part of the group and was separate from the others. (*See* Tr. 44:5-13).

[6] The government does not appear to argue that Mr. Hale's later flight should be included as a factor in this *Terry* analysis. (*See* Doc. 19 at 6-8). The Court agrees that this action should not be considered, primarily because the evidence clearly shows that the "stop" was already in progress when Mr. Hale fled. *See Hernandez*, 847 F.3d at 1264 (noting factors to be considered in determining whether a seizure occurred, including "whether the officers activated their siren or flashers, operated their car in an aggressive manner to block the citizen's course or otherwise control the direction or speed of his movement, displayed their weapons, or commanded the citizen to halt."). Here, numerous officers had surrounded the men, created a "perimeter" around them with their vehicles, turned on the flashers of at least one police vehicle, and ordered them to stop—all *before* Mr. Hale began to flee. (*See* Love Body Cam at 1:32-55, Tr. 15:17-23).

8

| | |
|---|---|
| [WHITTEN]: | In view, right. |
| [COURT]: | And you suggested that they sit on a curb? |
| [WHITTEN]: | Yes, because – |
| [COURT]: | And they did sit on the curb? |
| [WHITTEN]: | Yeah, on the curb itself. |
| [COURT]: | But what was suspicious before that? |
| [WHITTEN]: | Not being – not obeying a lawful command by an officer to stop so that we could find out who was there. |
| . . . | |
| [COURT]: | Well, if a command is in order, it's happening, is there anything before that that – |
| [WHITTEN]: | Before? |
| [COURT]: | Yes. |
| [WHITTEN]: | Before that, no. |
| [COURT]: | -- that you think was suspicious. |
| [WHITTEN]: | **Other than being where the call was, that was what led us to look at them.** |
| [COURT]: | All right. |
| [WHITTEN]: | **When they left when we arrived, that was one of the suspicious things that, when they're leaving and we're arriving, they know we're there and they don't want to stop.** |

(Tr. 52:16-54:7).

Though "nervous, evasive behavior" and "unprovoked flight" are relevant considerations in determining reasonable suspicion, *Wardlow*, 528 U.S. at 124, the Tenth Circuit has explained that nervousness, unless extreme and persistent, "is 'of limited significance' in determining whether reasonable suspicion exists." *United States v. Simpson*, 609 F.3d 1140, 1147-48 (10th Cir.

9

2010) (quoting *United States v. Williams*, 271 F.3d 1262, 1268 (10th Cir. 2001)). The Court must also consider that a person "has a right to ignore the police and go about his business" if the police lack reasonable suspicion or probable cause to stop him. *Wardlow*, 528 U.S. at 125 (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)). If casually walking away from a store after making a purchase is "nervous, evasive behavior," it is unclear what could possibly qualify as going about one's business.

Moreover, justifying a *Terry* stop by pointing to an individual's refusal to comply with an order to stop is circular and contrary to our Fourth Amendment jurisprudence. As stated by the Supreme Court in *Florida v. Royer*, a person "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." 460 U.S. at 498. *See also Florida v. Bostick*, 501 U.S. 429, 437 ("[A] refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.").

Thus, the only remaining "suspicious" behavior by Mr. Hayes is that he was present at the location referenced in the tip. Yet, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 119. The Court finds that a fact such as this "must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." *Simpson*, 609 F.3d at 1147 (quoting *United States v. Lee*, 73 F.3d 1034, 1039 (10th Cir. 1996), *overruled on other grounds by United States v. Holt*, 264 F.3d 1215, 1226 n.6 (10th Cir. 2001) (en banc)).

IV. **Conclusion**

Taking together the broad, anonymous tip received by the Tulsa Police Department and the

lack of suspicious behavior displayed by Mr. Hayes, the Court finds that the police officers lacked reasonable suspicion to stop Mr. Hayes—even when factoring in the "high crime" character of the area. Walking in one's own neighborhood—whether it is considered a "high crime" area or not—should not put a person under automatic suspicion of criminal activity.

For the foregoing reasons, Defendant Hayes's Motion to Suppress (Doc. 14) is **granted**.

**SO ORDERED** on this 11th day of September, 2018.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE